IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ACRADYNE, INC., an Oregon corporation,
and AUTOMOTIVE INDUSTRIAL MARKETING
COMPANY, an Oregon corporation,

                                Plaintiffs,                    Civil No. 04-362-AS

                        v.                                     FINDINGS AND
                                                               RECOMMENDATION

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, a Delaware
corporation,

                                Defendants.

_____

ASHMANSKAS, Magistrate Judge:

    Plaintiffs AcraDyne, Inc. ("AcraDyne), and Automotive Industrial Marketing, Inc.
("AIMCO")(collectively referred to as "Plaintiffs"), seek to recover sums paid in settling and
defending an action brought against them by AcraDyne's former President, Mark Lehnert.  Plaintiffs
contend that the sums paid to Lehnert were damages covered under the employment practices
liability insurance policy issued to AIMCO by defendant Travelers Casualty and Surety Company
of America ("Travelers") in late 2001 (the "Policy").  Additionally, Plaintiffs argue that the costs

incurred in asserting counterclaims were defense costs and are recoverable under the Policy. Travelers disagrees, claiming that the claims asserted by Lehnert and the defense costs sought by Plaintiffs are excluded under the express terms of the Policy.

<u>Background</u>

AIMCO is an Oregon-based importer and reseller of pneumatic tools and is the parent corporation of AcraDyne. AcraDyne is an Oregon corporation that designs and manufactures tools for assembly and fastening systems. On April 20, 1998, AcraDyne entered into an employment agreement with Lehnert for his services as President of AcraDyne (the "Agreement"). The term of the Agreement was six years. Lehnert was to receive an annual salary of $250,000 with a bonus and cost of living increase if AcraDyne was profitable.

The Agreement also provided that Lehnert would be entitled to participate in a stock option plan to be adopted by the Board of Directors of AcraDyne within 90 days of the date of the Agreement. Specifically, the Agreement provided that "AcraDyne is in the process of adopting an incentive stock option plan ("ISO"). It is agreed that the ISO will provide that Lehnert shall be granted an option to purchase 25% of the shares of the common, no par value shares of AcraDyne outstanding at the inception of this Agreement." Thomas Brown Affidavit, Exhibit B, Page 1. In the event Lehnert was terminated without cause, AcraDyne was obligated to repurchase any shares of AcraDyne stock purchased by Lehnert "at a value determined in accordance with generally accepted accounting principles under a stock repurchase agreement (whose general methodologies have been previously discussed and agreed upon by the principals hereto) that AcraDyne will enter into with Lehnert within ninety (90) days of the effective date of this Agreement." Thomas Brown Affidavit, Exhibit B, Page 3.

Both parties to the Agreement had the right to terminate the relationship with notice.  In the event AcraDyne terminated Lehnert without cause prior to the expiration of the Agreement, AcraDyne would continue to pay:

> Lehnert's salary, at the same payment intervals and in the same payment amounts in effect at the time of termination, until the end of the six-year term of this Agreement.

Thomas Brown Affidavit, Exhibit B, Page 3.

As a condition precedent to AcraDyne's obligation to continue Lehnert's salary, Lehnert agreed to execute and deliver to AcraDyne a full and complete release of all claims against AcraDyne, AIMCO and all related corporations, except for claims made to enforce payment of AcraDyne's commitment to continue Lehnert's salary and to compensate Lehnert for stock returned to AcraDyne. Id.

In March 2001, Plaintiffs reduced Lehnert's salary because of AIMCO's poor financial condition.  Plaintiffs represented that they would pay back the salary reduction once the company resumed profitable operations.  In March 2002, Lehnert exercised his stock options orally and by interoffice correspondence.  Plaintiffs refused to issue Lehnert any stock.  On June 10, 2002, Plaintiffs terminated Lehnert's employment.  Plaintiffs characterized the termination as "with cause" and discontinued salary payments under the terms of the Agreement. Thomas Brown Affidavit, Exhibit C.

In August 2002, Lehnert filed an action against Plaintiffs for "fraud and breach of contract" (the "Lehnert Action"). Thomas Brown Affidavit, Exhibit C, Page 2.  The fraud claim was based on allegations that Plaintiffs induced Lehnert to leave his prior lucrative employment by offering him stock options for stock they knew would never have any value.  The breach of contract claim was based on the reduction in Lehnert's salary while employed, Lehnert's right to a continuation of his

salary after termination and Plaintiffs failure to issue Lehnert any stock. In December 2002, Lehnert amended his complaint to add a claim for negligent misrepresentation, which mirrored the fraud claim, and a claim for unjust enrichment based on the products and processes invented by Lehnert while employed by Plaintiffs. Thomas Brown Affidavit, Exhibit D.

In April 2003, Plaintiffs' counsel, David Riewald, filed a number of counterclaims against Lehnert seeking injunctive relief, $25,000 in damages, attorney fees and costs, punitive damages and "any additional equitable relief deemed appropriate by this Honorable Court." Thomas Brown Affidavit, Exhibit F, Page 11.  Plaintiffs asserted counterclaims for:  1) breach of contract;  2) injunctive relief; 3) breach of fiduciary duties, 4) misappropriation of trade secrets; 5) conversion, 6) tortuous interference with contractual relations, business expectancy and/or business relationship; and 7) unfair competition.

The parties to the Lehnert Action attended a case evaluation session at which the panel recommended settling the Lehnert Action for $310,000.  Travelers agreed to contribute $90,000 to settlement based on the expected litigation cost of $100,000 less the $10,000 deductible under the Policy.  Plaintiffs paid Lehnert the remaining $220,000 and the Lehnert Action was dismissed. Plaintiff then filed this action against Travelers to recover the $220,000 it contributed to the settlement as well as $8,000 in attorney fees attributable to the counterclaims asserted in response to the Lehnert Action.

/ / / / /

/ / / / /

/ / / / /

Policy Language

The Policy[1] provides that Travelers:

> shall pay on behalf of the Insured all Damages on account of a Claim first made during the Policy Period for an alleged Wrongful Employment Practice. The Company shall have the right and duty to defend, and shall pay Defense Expenses, with regard to a Proceeding seeking Damages or injunctive relief, if such Proceeding asserts a Claim first made during the Policy Period, even if the Claim is groundless, false or fraudulent.

Policy, ¶ l.

> Wrongful Employment Practices is defined as:

> any of the following occurring in the course of and arising out of the Claimant's employment or application for employment with the Named Insured: (1) Wrongful Termination; (2) breach of oral, implied or written employment agreement; (3) employment-related misrepresentation; (4) Discrimination; (5) wrongful failure to employ; (6) wrongful failure to promote; (7) Sexual Harassment; (8) wrongful discipline; (9) retaliation; (10) wrongful denial of training; (11) wrongful deprivation of career opportunity; (12) wrongful denial or deprivation of seniority; (13) wrongful failure to grant tenure: (14) wrongful evaluation; (15) invasion of privacy; (16) employment-related defamation; (17) Protected Status Harassment; and (18) employment-related infliction of emotional distress.

Policy, ¶ ll(Q).

The Policy defines "Damages" as "money (including back pay and front pay, compensatory damage and punitive damages if insurable under applicable law), including prejudgment and postjudgment interest, which an Insured is legally obligated to pay as a result of a Claim." Policy, ¶ ll(B). The Policy expressly states, however, that the term "Damages" does not include "liquidated damages" (Policy, ¶ ll(C)(1)) or "severance pay or penalties under an employment contract, or any agreement, policy or procedure providing for payment in the event of separation from employment

---

[1]The Policy capitalizes and bolds all terms that are defined elsewhere within the Policy. In the interest of clarity, the court will not bold these terms in this Findings and Recommendation.

or sums sought solely on the basis of a claim for unpaid services under an express or implied

agreement." Policy, ¶ ll(C)(3).  Also excluded are:

> medical, pension, disability, life insurance or other similar employee benefits, except
> and to the extent that a judgment or settlement of a Claim includes a monetary
> component measured by the value of a pension, medical, disability, life insurance or
> other similar employee benefits as consequential damages for a Wrongful
> Employment Practice which is the basis for such judgment or settlement.

Policy, ¶ ll(C)(4).

Defense Expenses are defined as "reasonable and necessary legal fees and expenses incurred

in investigation and defense of Proceedings." Policy, ¶ ll(D).

The Policy specifically excludes coverage for any claim:

> arising out of facts, transactions or even which are or reasonably would be regarded
> as Wrongful Employment Practices, about which an Responsible Person had
> knowledge prior to the inception of coverage under the Policy, or under the First
> Policy issued to the named Insured by the Company provided that similar and
> uninterrupted coverage has been in force with the Company since that time.

Policy, ¶ ll(C).  Responsible Person is defined, in relevant part, as "(a) a partner, principal, officer

or director of the Named Insured * * * ."  Policy, ¶ ll(N).

## Legal Standard

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  "[T]he requirement is that there be no genuine issue of material fact." Anthes

v. Transworld Systems, Inc., 765 F. Supp. 162, 165 (Del. 1991) (citing Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247-48 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists

or that a material fact essential to the nonmovant's claim is absent. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322-24 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. <u>Id</u>. at 324. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see <u>Celotex</u>, 477 U.S. at 324.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. <u>Anderson</u>, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id</u>. at 250. On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id</u>. at 249-50 (citations omitted).

Discussion

Plaintiffs assert that, under the terms of the Policy, Travelers has a duty to indemnify them for the $220,000 they paid to Lehnert to settle the Lehnert Action. Plaintiffs also argue that Travelers should reimburse them the $8,000 paid to Plaintiffs' legal counsel for the time expended in asserting the counterclaims in the Lehnert Action. Travelers contends that all of the claims asserted by Lehnert in the Lehnert Action, as well as the counterclaims asserted by Plaintiffs, are expressly excepted from coverage under the Policy. Accordingly, the issue before the court is the proper construction of the relevant provisions of the Policy and application of such construction to the claims and counterclaims asserted in the Lehnert Action.

Under Oregon law, the interpretation of an insurance policy is ordinarily a question of law

for the court.  See, e.g., <u>Hoffman Construction Co. v. Fred S. James & Co.</u>, 313 Or. 464, 469 (1992).
The "primary and governing rule of the construction of insurance contracts is to ascertain the
intention of the parties."  <u>McLeod v. Tecorp International, Ltd.</u>, 318 Or. 208, 215 (1993), <u>quoting</u>
<u>Totten v. New York Life Ins. Co.</u>, 298 Or. 765, 770 (1985).  In interpreting an insurance policy, the
court must first examine "the text and context of the policy as a whole, to determine whether the
policy's text and context answer the question that is posed."  <u>McLeod</u>, 318 Or. at 215.

Where a term in an insurance policy is ambiguous, it must be interpreted against the drafter
of the language.  <u>Hoffman Construction</u>, 313 Or. at 470-71.  A term is only ambiguous, however,
when it is subject to two plausible interpretations.  <u>Id</u>. at 470.  To be plausible, an interpretation must
be reasonable in light of the particular context in which the term is used in the policy and the broader
context of the policy as a whole.  <u>Id</u>.

Lehnert alleged that Plaintiffs breached the Agreement by failing to pay him amounts due
under the Agreement after he was terminated without cause.  Travelers asserts that these amounts
are severance payments or liquidated damages and are specifically excluded under the terms of the
Policy.

Severance pay is not specifically defined in the Policy.  Therefore, the court must follow the
rules set forth in Hoffman to discern the intended meaning of the word.  The first step is to view the
term in the context of the policy as a whole.  The terms is found in an exclusion to damages which
provides that "severance pay or penalties under an employment contract, or any agreement, policy
or procedure providing for payment in the event of separation from employment."  This language
implies that the term "severance pay" includes any monies payable to an terminated employee
pursuant to an agreement.  Here, the Agreement provided that Lehnert was entitled to the payment

of his salary after his termination without cause. This obligation agreed to by Plaintiffs clearly falls within the meaning of the term severance pay as set forth in the Policy.

Plaintiffs ask the court to impose additional restrictions on the term severance pay based on dictionary and court definitions of the term. For example, Plaintiffs assert that the severance pay must be determined based on length of service. This is contradictory to the terms of the Policy. The language of the Policy requires only that the pay be pursuant to an agreement, policy or procedure. It does not require that the agreement, policy or procedure base the amount due on the years of service.

Plaintiffs also argue that severance pay must be intended to alleviate the need for economic readjustment upon termination. The court is not convinced that this is a required element for severance pay. In any event, it is clear that the element is met in this scenario. Lehnert entered into an agreement to work for Plaintiffs for six years at a salary of $250,000 per annum. He was entitled to rely on this agreement in making his financial decisions during that period of time. He was terminated prior to the end of his six-year term which, in the absence of the continued payment of the sum due under the Agreement, would have required significant economic readjustment. The contractual payments due Lehnert after his termination allowed him to continue to support his financial obligations until he was able to find replacement employment.

In the context of the Policy as a whole, severance pay means any monies payable to an terminated employee pursuant to an agreement, policy or procedure. This encompasses Plaintiffs' obligation to continue Lehnert's salary under the terms of the Agreement. Lehnert's claim for this compensation is specifically excluded from Damages covered by the Policy and is not recoverable by Plaintiffs.

Lehnert alleged in his complaint that Plaintiffs reduced his salary in March 2001 in violation of the Agreement and sought recovery of those unpaid amounts. Travelers contends that this is a claim for "unpaid services under an express or implied agreement" and is excluded under the Policy. The court agrees.

The Agreement provides that Lehnert shall perform certain services and be paid a specified amount for those services. The parties agree that Lehnert did not receive his contractual compensation for his services beginning in March 2001. Plaintiffs argue that while Lehnert was not fully paid for these services, he was partially compensated and, therefore, the claim does not qualify as "unpaid services." This is a distinction without a difference. The court could just as easily determine that when Lehnert's salary was decreased by 25%, he was paid for only 75% of the services he performed. He was not compensated for the remaining 25% of the services rendered. Accordingly, his claim was for payment for these "unpaid services." The claim is excluded under the terms of the Policy as "unpaid services."

The Lehnert Complaint includes a claim for failure to issue and repurchase Plaintiffs' stock as well as for rendering the stock valueless. Plaintiffs characterize this claim as a breach of the Agreement and seek indemnification. Travelers contends that this claim is not a Wrongful Employment Practice as defined in the Policy and that the damages sought are in the nature of equitable relief and are not recoverable.

The Agreement provided that Lehnert would be entitled to participate in a to-be- formed incentive stock option plan (the "Plan"). Lehnert was to be granted an option to purchase 25% of the outstanding stock, vesting equally over a five-year period, with the option exercise price set at 25% of AcraDyne's aggregate book value as of the date of the Agreement. The Agreement also

provided that the Plan would be developed within ninety (90) days of the Agreement.  The alleged breaches, which were "failing to acknowledge Lehnert's exercise of his option to purchase 25% of AcraDyne's stock and by failing to issue the stock to Lehnert" as well as "taking actions to render the stock of AcraDyne valueless and thereby defeat Lehnert's stock option rights" were breaches of the Plan, not the Agreement.  The Agreement did not provide the mechanics for the exercise of the option, the issuance of the stock or the valuation of AcraDyne, only that a Plan would be formed and Lehnert would be entitled to stock options under the Plan.  It appears from the Lehnert Complaint that Plaintiffs complied with these requirements.

Breach of an incentive stock option plan, such as the Plan, is not included within the definition of Wrongful Employment Practice.  Accordingly, Lehnert's claim based substantially on a breach of the Plan are not covered by the Policy.

Lehnert alleged that Plaintiffs made certain misrepresentations to induce him to leave his former employer.  He asserts claims for both fraudulent and negligent misrepresentation.  Travelers contends that these claims do not qualify as a Wrongful Employment Practice covered by the Policy.

Plaintiffs argue that the allegations support a claim for an "employment-related misrepresentation" which is a covered Wrongful Employment Practice under the Policy.  All of the instances of misrepresentation alleged in the Lehnert Complaint occurred before Lehnert became employed by Plaintiffs.  Accordingly, all of the misrepresentations occurred before an employment relationship existed.  In the absence of this relationship at the time the misrepresentations were allegedly made, the claims do not fall within the plain meaning of "employment-related misrepresentations."  A misrepresentation is not "employment-related" if there is no employment at the time they are made.

Additionally, the alleged misrepresentations relate primarily to the Plan and Plaintiffs' failure to abide by the terms of the Plan. As noted above, breach of the Plan is not a covered "Wrongful Employment Practice." Similarly, misrepresentations specifically related to the Plan do not qualify as a wrongful employment practice under the Policy.

Also, Travelers' counsel argued that the misrepresentations are excluded under the Policy as claims that existed at the time the Policy was issued. The Lehnert Complaint clearly alleges that Doug Hall, President of AIMCO, contacted Lehnert and asked him to come to work for AcraDyne. Subsequently AcraDyne and AIMCO made numerous promises to Lehnert to convince him to leave his current employment and join AcraDyne. While Lehnert does not specifically allege who made these promises, it is evident that they had to be made by a "partner, principal, officer or director" of AIMCO or AcraDyne in order to be binding upon the corporations. Consequently, it is clear from the allegations of the Lehnert Complaint that a responsible person was aware of the misrepresentations made to Lehnert before Lehnert's employment began in April 1998.

The Policy attached to the complaint by Plaintiffs was issued effective December 7, 2001, well after the alleged misrepresentations were made. It is clear from the record that Plaintiffs knew of the misrepresentations prior to the inception of coverage under the Policy. Lehnert's claims for misrepresentation, both fraudulent and negligent, are excluded under the express terms of the Policy. Plaintiffs are not entitled to reimbursement for damages relating to these claims.

Lehnert amended his complaint to add a claim for unjust enrichment based on benefits that Plaintiffs allegedly received from certain products and processes that Lehnert invented while in Plaintiffs' employ. Lehnert sought damages for this claim. Travelers is of the opinion that Lehnert's unjust enrichment claim does not fall within the Policy's definition of "Wrongful Employment

Practice." The court is of the same opinion.

Plaintiffs argue that Lehnert's unjust enrichment claim is based on the alleged wrongful termination of Lehnert, as well as the alleged misrepresentations made by Plaintiffs to convince Lehnert to join AcraDyne. The court has already determined that the Policy does not cover misrepresentations that occurred prior to the start of the employment relationship or that Plaintiffs were aware of prior to the inception of the Policy. Additionally, there is no allegation that Lehnert was wrongfully terminated. The Agreement specifically provided that Plaintiffs could terminate the employment relationship with or without cause.

Lehnert's unjust enrichment claim is not a "Wrongful Employment Practice" as defined by the Policy. As such, Plaintiffs are not entitled to indemnification for any amounts they paid to settle that claim.

Travelers has refused to pay $8,000 in legal expenses incurred with regard to the counterclaims asserted by Plaintiffs after Lehnert filed his amended complaint asserting claims for unjust enrichment. Travelers contends that the filing of counterclaims is an offensive action to recover damages which does not fall within the plain meaning of the term "Defense Expenses."

Plaintiffs' counterclaims alleged that Lehnert breached the Agreement, breached his fiduciary duties to Plaintiffs, misappropriated trade secrets, converted Plaintiffs' product, interfered with contractual relations and engaged in unfair competition. Plaintiffs' counsel explained that he filed the counterclaims as a defensive tactic in the hopes of moving the action closer to settlement. The amounts prayed for in the counterclaims were minimal and, if ever awarded to Plaintiffs, would have offset the amounts due to Lehnert. This is not a case where an insured acted in the offensive in the hopes of recovering a significant amount of money. To the contrary, the counterclaims were

responsive to the claims asserted by Lehnert and, if successful, would have inured to the benefit of Travelers. Additionally, the work needed to investigate and file the counterclaims was closely related the work necessary to investigate and defend Lehnert's claims for unjust enrichment. The filing of such counterclaims is properly characterized as a defensive strategy and is covered by the Policy as an expense reasonably incurred in the defense of the Lehnert Action.

Conclusion

On the issue of indemnification by Travelers of Plaintiffs for the difference between the $310,000 settlement paid by Plaintiffs and the $90,000 contributed by Travelers, the court find that Lehnert's claims were not covered by the Policy and Plaintiffs are not entitled to indemnification. Accordingly, Plaintiffs' motion for summary judgment should be DENIED and Defendant's motion for summary judgment should be GRANTED with regard to Plaintiffs' claim for indemnification. On the issue of the $8,000 of unreimbursed "defense costs", the court finds that Plaintiffs' counterclaims were a reasonable and necessary defense tactic and were covered by the Policy. Accordingly, Plaintiffs' motion for summary judgment should be GRANTED and Defendant's motion for summary judgment should be DENIED with regard to Plaintiffs' $8,000 in unreimbursed defense costs. In the event this Findings and Recommendation is adopted, a judgment should be entered in favor of Plaintiffs in the amount of $8,000.

Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **December 6, 2004**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a

/ / / / /

response to the objections is due fourteen days after the date the objections are filed and the review

of the Findings and Recommendation will go under advisement on that date.

DATED this 18th day of November, 2004.

/s/ Donald C. Ashmanskas
DONALD C. ASHMANSKAS
United States Magistrate Judge